Filed 5/18/16  Alesha K. v. Superior Court CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ALESHA K.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A147821<br><br>(Contra Costa County<br>Super. Ct. No. J14-01205) |

## I.

## INTRODUCTION

Alesha K. (mother) seeks review by extraordinary writ of a juvenile court order setting a hearing pursuant to Welfare and Institutions Code section 366.26,[1] to consider termination of parental rights and to select a permanent plan for her nine-year-old daughter, A.K.  Mother contends the juvenile court erred by terminating her family reunification services at the 12-month status review hearing pursuant to a finding that there was no substantial probability that A.K. could be returned home within 18 months

---

[1]  Statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

after her initial removal.  We reject this contention and deny mother's petition on the merits.

**II.**

**STATEMENT OF FACTS**

**A.** *Background*

On November 9, 2014, the Contra Costa County Sheriff's Department received a report that a man was threatening to batter his wife.  The responding officers found seven-year-old A.K. and her parents living in a van.  The van was in a deplorable condition; there was garbage thrown about, animal feces on the floor, and the vehicle smelled like urine.  Three dogs were living in the van with the family, flies were swarming around, and there was a broken "meth" pipe on the seat next to A.K.'s mother.  A.K. was filthy, appeared to have lice, and had no shoes to wear.  Both parents were under the influence of methamphetamine and were placed under arrest.  The county's Children and Family Services Bureau (the Bureau) was notified that A.K. had been taken into protective custody.

Later that morning, the social worker interviewed A.K., who reported that her 16-year-old sister M.K., and 17-year-old brother D.K., were living nearby in the home of a friend.  A.K. said her family had moved many times and that she had attended 16 schools.  The family had moved to California from Washington so mother could help her friend care for a sick relative.  But after the adults had a fight, the friend locked the family out of her home.  Occasionally, they stayed in motels, but a few months earlier they had been staying at a motel in Pittsburg when a man held a gun to A.K.'s head.  A.K. reported that her father got the gun away and stabbed the man, who ended up going to jail.  A.K. told the social worker that she worries when her dad yells at her mother and when her dad smokes "weed."  For work, her dad collected cans and turned them in for money.  A.K. had not been to a doctor for a long time and she said that she needed a dentist because she had "big holes" in her teeth.

The Bureau located A.K.'s siblings living in the home of a family friend.  The police officer who accompanied the social worker to check on the children was familiar

2

with this family because she was the officer who responded to the report when a man held a gun to A.K.'s head. The officer told the social worker that the man was mentally ill and he and A.K.'s father had an argument over drugs. At the home, the social worker interviewed M.K., D.K., and the friend who took them in.

M.K. reported her parents have a history of domestic violence and she and mother were afraid of father. M.K. also reported mother has two older children who were removed from her care when she lived in Washington and were raised by their maternal grandmother. D.K. confirmed his father has anger issues and reported that father punched him when he was in trouble. D.K., who is developmentally disabled, told the social worker that he suffered brain damage when an uncle ran over him with a truck.

When asked about their current situation, M.K. explained that when mother and the kids moved to California to live with mother's friend, father was in jail. After father rejoined the family, mother's friend kicked them out because she said father tried to choke her. The family had been living on the streets for over a month when M.K. met a friend through church who allowed M.K. and her brother to stay with her. But, there was not enough food for them and the home had cockroaches. In October, M.K. became so depressed about her life that she had to be hospitalized on a section 5150 hold. She told the social worker she was tired of moving all the time, changing schools so often and not being able to have friends; she had never been to a mall or a movie theatre; and she wanted a stable life.

M.K.'s friend told the social worker the family had been living in their van outside her home, but she got so many complaints she told them to move. She agreed to take in the older children for a few weeks, but she could not take A.K. because her son had been accused of sexually molesting a girl close to A.K.'s age. The friend admitted she relied on a food bank to support her own six children and that she did not have the means to care for M.K. and D.K. The friend also reported she had contacted A.K.'s parents and told them she could not take care of their children, but the parents did not come to pick them up.

On November 12, 2015, the Bureau filed a juvenile dependency petition alleging jurisdiction over A.K. under section 300, subdivision (b) [failure to protect], and subdivision (g) [no provision for support].  The petition was supported by allegations that parents were chronic drug abusers; the living conditions in the van created a substantial risk of harm; and both parents had been incarcerated.  On November 13, the juvenile court ordered that A.K., M.K. and D.K. be detained.  The Bureau was to provide parents with substance abuse treatment and parenting education pending the next hearing.  Parents were also granted weekly supervised visitation.  The children were placed together in a foster home.

A jurisdiction hearing was set for January 5, 2015.  The matter was continued so mother could participate in mediation, but eventually a contested hearing was held on February 5.  At the hearing, the court ordered parents to submit to drug tests.  Mother's test was negative; father tested positive for methamphetamine, cocaine and THC.  With respect to A.K.'s petition, both parents pled no contest to amended allegations under section 300, subdivision (b), and the court found the allegations to be true.  The court also exercised jurisdiction over M.K. and D.K. under section 300, subdivision (j), based on allegations of abuse or neglect of a sibling.

**B.** *Disposition*

A March 2015 disposition report recommended that the court declare A.K. and her siblings court dependents and that both parents be afforded reunification services.  The disposition report provided additional information about the family's background and circumstances.

Father reported he was born in Indiana and has Indian heritage through the Chippewa tribe, but he was adopted by a family outside of the tribe.  Father also reported physical and emotional abuse by his adoptive parents.  When he was eight, he started taking psychotropic medication, and he began drinking and smoking marijuana when he was 12.  Around that time, he was placed in a residential treatment center for emotionally disturbed children.  When father was 16 he started taking "crank," which he described as "the Serotonin that my brain needs."

4

Mother, who was raised in Washington state, started drinking at age 14, and took other drugs during her teenage years, although her "drug of choice was hard liquor." At age 19, she started a relationship with a man who became the father of her two oldest children. Mother maintained that she stopped drinking when she had her children, but when they were four and five, the children were removed from mother based on allegations of alcoholism. Mother did not participate in the reunification process but instead agreed to allow her mother to become the children's guardian. By that time, mother was in a relationship with father and pregnant with D.K.

The family was living in Idaho when D.K. suffered a traumatic brain injury. When D.K. was a year old, a family friend backed his truck out of a driveway and knocked D.K. down and then ran over his head. M.K. was born in Idaho, but then the family made moves to several different states so father could find work in the construction industry. In 2007, father hurt his back and became dependent on pain medication. After several more moves, the family ended up in California, where father increased his drug use because "meth was readily available in exchange for odd jobs." Father was unable to find housing or work in California, and he told the social worker that he took full responsibility for what had happened to his family.

Both father and mother claimed mother did not have a drug problem. Father told the social worker that on the day the children were detained, he had an altercation with mother because of all the pressure the family was experiencing, and he was high at the time, but mother was not. In early February 2015, mother finally admitted to the social worker she had used some drugs, but she continued to deny "chronic" use. On February 18, mother enrolled in an outpatient treatment program. When she tested positive for methamphetamine that day, mother stated that she had no idea why. Both parents had been referred to drug testing, pending the disposition hearing. Between November 26 and February 23, mother had four negative tests and nine no shows. Father had one negative test and 11 no shows. Father reported that it was impossible for him to stay clean at the shelter where he was living.

5

A.K. and her siblings were living together in a foster home and participating in supervised weekly visits with their parents. A.K. had been treated for lice and also obtained dental care which required anesthesia so she could receive seven fillings and three caps. A.K. appeared immature but was on track in terms of physical development. She was enrolled in the first grade but at risk of not reaching grade-level benchmarks in all subjects. A.K. had repeated kindergarten but still had many gaps in her education. School records showed a pattern of absences and tardiness.

The disposition report contained an assessment of the family which began with this observation: "We would like to say that [father and mother] are making a diligent effort to begin services to address their life controlling issues, but that is not the case. [Mother] is a gentle person who obviously loves her children, however, she has continued to deny the existence of a drug problem in the face of positive tests, and the fact that she was allowing her children to live in deplorable conditions. Indeed, she seems oblivious to the fact that there w[ere] severe neglect issues in terms of the children's living conditions, dental neglect, and horrendous school attendance."

The Bureau opined that mother's denial about her drug problem was preventing her from getting the services she needed and the best help that was available to her. "Meanwhile," the Bureau reported, father "has taught the entire family to mistrust authority, and the information we are getting at this point mostly minimizes the neglect that the family has suffered." The Bureau acknowledged father had been honest about his drug problem but he had failed to follow through with referrals for treatment. Domestic violence was another problem the children had acknowledged, but which both parents largely denied. Finally, the Bureau had experienced serious difficulty obtaining paperwork and signatures from parents which was needed in order to obtain an IEP (independent education plan) for A.K., who was not passing first grade standards, and for D.K., who had special education needs. Despite these problems, the Bureau opined that mother and father could make the necessary life changes with the right help.

The disposition hearing was held on March 11, 2015. The court adjudged A.K. a dependent of the court under section 300, subdivision (b); removed her from the physical

custody of her parents; and ordered the Bureau to provide reunification services to both parents. The court also ordered twice monthly supervised visitation and that mother and father were to visit separately.

### C. *Six-Month Review*

In August 2015, the court scheduled a six-month review hearing for A.K. and her sister. By that time, D.K.'s case was being treated separately because he had turned 18 and had special needs. The Bureau recommended the girls continue as dependents and that both parents receive additional reunification services.

During this reporting period, mother had transitioned from her outpatient program into a residential program offered by the same service provider. Through her program, mother obtained individual therapy, and participated in a parenting class and an anger management program. In May, she enrolled in domestic violence counseling and subsequently reported that she attended seven or eight classes. She continued to produce negative drug tests, but also had several no shows. After her residential program ended in July 2015, mother experienced some challenges. She told the social worker she lived on the street and then with a friend until she was accepted into a sober-living home in Hayward, although she failed to provide contact information to the Bureau during that transition period. Mother struggled with organization and had trouble getting herself to places she needed to be. Her continued participation in a 12-step program after she left residential treatment was not verified.

Meanwhile, father failed to engage in most of his services. He claimed he did not need domestic violence counseling; he did not participate in individual counseling; and passed on several opportunities for substance abuse services. He did see a psychiatrist who reported that he needed a dual diagnosis inpatient program. The Bureau attempted to make a referral for that service, but it could not be implemented until father resolved some issue with his SSI. Father had become very involved in his 12-step program community and reported that he had not used methamphetamine since June 26. During this reporting report, father had three positive drug tests and 19 no-shows.

7

A.K. and her brother were still living in the same foster care placement, but M.K. had moved to a different home nearby. Initially, the move was temporary, in order to give M.K. a respite from the burden of having to assume a parental role for her younger sister. But both girls adjusted well to the separate living arrangement and felt they got along better when they lived apart. Despite this positive move, there had been a "recent" incident when M.K. texted her mother that she no longer wanted to live. Mother became concerned and contacted father, who asked for a welfare check at the foster home. Law enforcement went to the home and determined that M.K. was not at risk. Later, M.K. explained to the social worker she was upset because she learned that mother had lied to her by claiming she was not seeing father when she actually was continuing a relationship with him. M.K. was very upset mother would continue to see father when he was not making the necessary changes in his life.

Meanwhile, A.K. completed the first grade. Although she needed improvement in some subjects, the results of her assessments showed that A.K.'s academic problems were attributable to the fact she had not learned to read because she missed so much school. A.K. was also diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), but medication was not recommended as it was thought that the condition may be rooted in anxiety. Over the summer, A.K. had participated in a program which increased her love of literature and inspired her to practice reading. A.K. was very proud to read 42 pages of a book to the social worker during a recent visit. A.K. had also been participating in mental health counseling. She was "processing" her experiences, and was clear that she did not want to be homeless again. She was happy in her foster care placement, felt safe, and was also happy that she was not living with her sister. Her therapist reported that she likely suffered from Post-Traumatic Stress Disorder (PTSD).

The Bureau reported the children could not be safely returned to the parents at the six-month status review. Father was homeless and had only minimally engaged in services to address the problems that led to the dependency. Mother had verbalized she needed to make a life for herself and the children that did not include father. But, she could not have her children live with her in her current living situation, "although she

8

ha[d] made considerable progress toward her recovery." The Bureau characterized mother as a "gentle person, who loves her children" and is "honestly making an effort to push forward with services, but is fairly handicapped by her disorganization." She continued to miss drug tests and had not managed to utilize fully the resources that were offered to her.

At the six-month review hearing, the juvenile court found that A.K. and M.K. continued to be dependent children who could not be safely returned to parents, and that both parents were entitled to an additional period of services. The court also gave the Bureau discretion to authorize unsupervised visits for mother, and to authorize overnight visits if mother began showing up for all drug tests.

### C. *12-Month Review*

The 12-month review hearing was set for February 11, 2016.[2] The Bureau recommended the court order that A.K. and M.K. continue as dependents of the juvenile court; that reunification services to mother continue; and that reunification services to father be terminated.

Since the last review hearing, mother had moved several times. In September 2015, she moved to a clean and sober home in Stockton. In October, she moved to Lodi, and in January 2016 she returned to Stockton and found transitional housing for herself and her son D.K., who had elected to leave his placement. With assistance from the social worker, mother was enrolled in services offered by the Women's Center in Stockton. Mother reported she had attended some programs, but the Bureau had not verified those reports. Since July 2015, mother had five negative drug tests and 14 no shows. There was still no verified participation in 12-step meetings.

During this reporting period, father made minimal effort to participate in some services and no effort to participate in others, and continued to pass up opportunities for substance abuse services. In December 2015, he told the social worker "I'm a broken

---

[2] The status review was originally scheduled for January 7, 2016, but the court granted a continuance so the Bureau could address recent changes in mother's living situation.

9

man and will never be able to be clean and sober. You won't accept me on marijuana."
In February 2016, he appeared more motivated to get into a program and the social worker was attempting to assist him in following up on a few possibilities.

Since the last review hearing, A.K. had moved to a new foster home because she began "acting out" at her original placement after her brother elected to leave that home. A.K. was doing well in her new placement. In January, A.K. had started taking medication for her ADHD, and her second grade teacher reported that she had been more focused and better able to complete her work.

During most of this reporting period, mother had weekly, two-hour supervised visits with her girls. From November 21, 2015, until January 18, 2016, mother had weekly unsupervised visits for eight-hour periods, but the Bureau had to discontinue those unsupervised visits after it discovered that mother was allowing father to participate in them.

The Bureau advised the court that it would not be safe to return A.K. or M.K. to their parents at the 12-month status review for the following reasons: "[Mother] is living in a transitional housing situation, and there is room for the children, however, [mother] needs to have a sustained period of time with consistency in participation in her services. Also, [mother] is not able at this time to set boundaries to keep father away. [Father] has made minimal progress with the issues that brought this family to the attention of the Bureau."

Despite these circumstances, the Bureau recommended that mother receive an additional period of reunification services because she had a gentle way and close connection with the girls, and she was "close" to complying with her case plan. However, the Bureau acknowledged that mother allowed father to join in on her unsupervised visits even though she had been warned she could be risking reunification. The Bureau also expressed concern that the family had a pattern of blaming others for their bad choices: "Deceit and cover-up is the modus operandi for this family and it is easy until it backfires as with the visits that they conspired together to hide. This is not a

good parental example, to add this anxiety to their children's lives when they so want to reunify with their mother."

The first session of the 12-month review hearing was held on February 11, 2016. Neither parent appeared at that hearing, although mother's counsel stated that mother was on her way. It appears that during an unrecorded part of the hearing, the juvenile court advised counsel it did not intend to follow the recommendation to continue reunification services to mother. On the record, the children's counsel advised the court M.K. was very upset, frustrated and depressed that she was not allowed to live with mother. Counsel explained M.K., who was present in the courtroom, was almost 17½, and felt she should have control over where she lived. After the court attempted to commiserate with M.K., the matter was continued for a contested hearing.

On March 14, 2016, at approximately 10:30 a.m., the juvenile court stated that it would proceed with the contested hearing. The matter had been set for 10:00 a.m. and both parents were ordered to appear, but neither was present. The court reiterated it did not believe it could find there was a substantial likelihood that the girls could be returned to mother if services were continued until the 18-month deadline, which was less than 60 days away. The Bureau submitted on its reports; the children's attorney reiterated that M.K. was "at her limit as far as being able to tolerate" her current situation; and mother's counsel called the social worker to testify about the Bureau's recommendation to extend mother's reunification period. As the social worker prepared to testify, mother arrived at the hearing.

The social worker testified that mother was still in transitional housing but that her temporary home did meet the minimum sufficient level to accommodate the girls. Mother had completed an inpatient substance abuse program, but the Bureau had not been able to verify mother's reports about participating in outpatient services while living in Hayward. Mother claimed she was substance free, but her drug testing had been "pretty erratic" until the beginning of 2016. Recently, mother had told the social worker she missed so many tests because she did not have bus tickets, but during the periods she was not testing, mother did not ask for more tickets. The social worker also testified

11

mother's current residence was walking distance to the testing center, and she was also able to walk to her domestic violence program.

When asked whether she was requesting that mother receive an additional period of reunification services, the social worker gave this response: "That's what I've asked for. I mean, I would like to see her get that. I understand at the same time that, you know, services and compliance have been very poor over the life of the case, even though she's kicking it into—she's being more consistent now than she has been in the past. I think it's helped just having a roof over her head, a place that is her own, even though it's small." The social worker testified that over the last several months, mother's communication with the Bureau had been very poor, but she also acknowledged that there had been some improvement since mother moved to her current housing.

At the conclusion of the March 14 hearing, the Bureau submitted the matter without argument. A.K.'s counsel made the following brief remark: "Your Honor, the 18-month by my calculation runs on May 9th. I don't see any harm in continuing it until then. I think that's about six weeks away. So I'm asking the Court to grant mom more services." Mother's counsel argued that the recent stability in housing had enabled mother to be more consistent about drug testing and to engage in all of her services which showed that mother would "be able to stand independently and parent these children without [father]." Father's counsel requested that both parents be afforded services to the 18-month deadline and objected to the termination of services to either of them.

The juvenile court found that mother had "done very little at all in terms of true compliance with her case plan," observing that she had short periods of compliance, followed by longer periods when she was "completely out of compliance." Furthermore, the social worker had afforded mother a very high level of assistance, going so far as to drive her to her services. The court opined that if mother was really in a position to reunify, she would have been demonstrating that she could get herself to appointments. Beyond that, mother gave father access to the children during mother's unsupervised time, failing to even pick up the phone and notify the Bureau. Thus, mother was "not in a position to keep the children safe."

12

Despite its concerns about the level of mother's compliance, the court also found that M.K. and A.K. were in very different situations. M.K. was 17, and was visibly "miserable." The court surmised that if mother's services were terminated, M.K. would likely walk away from her placement once she turned 18, if she even waited that long. A.K., on the other hand, was still a very young child and the risk to her was different than the risk to her older sister. Under the circumstances, the court concluded that it would extend services in M.K.'s case until the 18-month deadline, but that it would terminate services for A.K. and set her case for a section 366.26 hearing.

On March 16, 2016, the juvenile court signed and filed an order in which it adopted amended findings proposed by the Bureau in light of the court's prior ruling. Those findings included the following: A.K. continued to be a dependent child; reasonable services were offered or provided to both parents; returning A.K. to the custody of parents would create a substantial risk of detriment; mother and father both failed to participate regularly and make substantive progress with the court-ordered treatment plans; and family reunification services were terminated. The court also found that "[t]here is not a substantial probability that the child will be returned to the physical custody of her parents by May 9, 2016[,] even if services are extended to that date." Accordingly, A.K.'s case was set for a section 366.26 hearing.

### III.

### DISCUSSION

The sole issue raised in mother's writ petition is whether the juvenile court erred by refusing to provide mother with additional reunification services in A.K.'s case up until the 18-month deadline, which was less than two months away.

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely

13

determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.)

Because A.K. could not be safely returned to mother at the 12-month review, the juvenile court had discretion to extend the reunification period to the 18-month deadline only if it found that: (1) reasonable services had not been provided; or (2) there was a substantial probability that A.K. would be returned to the physical custody of mother and "safely maintained in the home within the extended period of time . . . ." (§ 366.21, subd. (g)(1).) Mother does not dispute that she was provided reasonable services, but she does argue that there was a substantial probability that A.K. would be returned to her care had she been provided with an additional six weeks of services.

In order to find that there is a substantial probability that a dependent child will be returned to the physical custody of a parent and safely maintained in the home within the extended period, the court must find the following: "(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1).)

In this case, mother contends there is substantial evidence establishing each of these circumstances as to her: she consistently visited A.K.; made significant progress on her case plan and demonstrated that she can provide a safe home by living independently from father. There are several problems with this argument.

First, mother's analytical approach is flawed. The pertinent inquiry is whether substantial evidence supports the juvenile court's finding that it was not substantially likely that A.K. could be returned to mother's home if services were extended for an additional six weeks, not whether a contrary finding could also have been made.

Second, there is substantial evidence mother did not make significant progress on her case plan or demonstrate her capacity and ability to keep A.K. safe and provide for

her physical and emotional well-being during the 16-month period she was afforded reasonable services. The only part of that time period during which mother consistently participated in services was when she was in a residential treatment program. Furthermore, mother had the opportunity to demonstrate her ability to keep A.K. safe during unsupervised visits. Instead, she allowed father to share in those visits. More troubling, mother did not notify the Bureau about father's unsupervised contact with A.K., and then made excuses for failing to do so.

A third flaw in mother's claim is that she overlooks the discretionary component of the juvenile court's ruling. Since mother was afforded reasonable services, the court had to find a substantial probability that A.K. could be returned by the 18-month date in order to extend the reunification period, and it could not make that finding unless the three factors outlined above were satisfied. However, in exercising its discretion, the court was free to consider additional relevant factors. Here, for example, time was clearly not on mother side. By the time the 12-month status review was completed, there were only six weeks left before the 18-month deadline. Another important factor in this case pertained to credibility. A.K.'s situation grew out of an environment of secrecy and deception. The juvenile court was in the best position to assess whether mother was really committed to her case plan and actually capable of achieving compliance.

Mother contends that the objective evidence demonstrates that she did make significant progress on her case plan even after her residential program ended because she "consistently tested clean/negative," and she also engaged in parenting education and domestic violence programs. The flaw in this argument pertains to the issue of consistency. Although mother produced negative drug tests, she did not consistently participate in that testing requirement. Furthermore, as the juvenile court found, there were material gaps in mother's participation in her other services. Mother also relies on evidence that she secured her own housing separate from father. But she ignores her recent decision to give father unsupervised access to A.K. notwithstanding that father completely failed to address the issues which led to this dependency. That decision not

15

only posed a risk to A.K., it demonstrated that mother herself failed to demonstrate the necessary commitment to her own case plan.

Mother also contends that the juvenile court's ruling contradicts the legislative intent of the dependency scheme that focuses on preservation of the family. However, the statutory provision upon which mother relies makes clear that the "focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (§ 300.2.) Here, there is no dispute that mother was afforded 16 months of services designed to preserve her family. Despite the opportunity afforded to mother, she failed to demonstrate that she has the capacity to provide for the safety, protection, and physical and emotional well-being of A.K. At the same time, the record shows A.K. is thriving in a foster home where her physical and emotional needs are being met, perhaps for the first time in her life.

Finally, mother erroneously relies on *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, a case which reinforces our conclusion by expressly affirming that "[a]t the 12-month review, if the court does not return the child and finds that there is no substantial probability of return to the parent within 18 months of the original removal order, the court *must* terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan." (*Id*. at p. 249, italics added.) Here, as discussed, substantial evidence supports the juvenile court's finding that there was not a substantial probability that A.K. could be safely returned to mother even if the reunification period was extended to the 18-month deadline.

## IV.
## DISPOSITION

The petition for extraordinary relief filed by mother is denied on the merits. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
STREETER, J.


A147821, *A.K. v. Superior Court*